OSCN Found Document:STEPHENS PRODUCTION COMPANY v. LARSEN

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 STEPHENS PRODUCTION COMPANY v. LARSEN
2017 OK 36
Case Number: 111489
Decided: 05/09/2017
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2017 OK 36, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

STEPHENS PRODUCTION COMPANY, a division of SF Holding Corp., Plaintiff/Appellee,
v.
ROYCE LARSEN, Defendant/Appellant,
and
NELLIE ALLEN, et al., Defendants.

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION IV, ON
APPEAL FROM THE DISTRICT COURT OF HASKELL COUNTY, STATE
OF OKLAHOMA, HONORABLE BRIAN C. HENDERSON

¶0 Stephens Production Company brought a condemnation action pursuant to 52 O.S. 2011 §§ 36.1-36.7 to condemn an underground natural gas reservoir in Haskell County known as the Hunton Formation. Landowner Royce Larsen objected to the Commissioners' report, and the District Court held a bench trial, setting the amount of just compensation at $9,000.00. Mr. Larsen appealed, and the Court of Civil Appeals affirmed. We granted certiorari to address an issue of first impression. Upon review, we affirm the decision of the District Court.

COURT OF CIVIL APPEALS' OPINION VACATED; DECISION OF THE
DISTRICT COURT AFFIRMED

Stratton Taylor, Toney D. Foster, Mark Ramsey, Clint Russell, Taylor, Foster, Mallett, Downs, Ramsey & Russell, Claremore, Oklahoma, for Plaintiff/Appellee
William H. Huffman & Terence P. Brennan, Levinson, Smith & Huffman, P.C., Tulsa, Oklahoma, for Plaintiff/Appellee
Dan Biersdorf, Biersdorf & Associates, P.A., Minneapolis, Minnesota, for Defendant/Appellant

GURICH, V.C.J.

¶1 Stephens Production Company filed a Petition to exercise eminent domain power pursuant to the Underground Storage of Gas statutes[1] to condemn underground natural gas storage easements and surface easements to complete an underground natural gas storage facility on and underneath approximately 900 acres of mostly rural property in Haskell County. Approximately 140 Defendants were named in the Petition. Stephens Production had previously offered such Defendants "just market value" for their respective interests, but the Defendants refused the offers. The trial court appointed three commissioners to value just compensation due for each Defendant listed in the Petition. Upon submission of the Commissioners report, all Defendants except one, Royce Larsen, the Appellant herein, settled with Stephens Production.

¶2 Mr. Larsen owns an 80-acre parcel within the 900 acres. The Commissioners valued Mr. Larsen's property taken and the damage to the remainder at $12,400.00. Mr. Larsen objected to this amount, and his case proceeded to trial. Mr. Larsen's expert testified the just compensation value was approximately $419,000.00. Stephens Production's expert valued the just compensation at $9,000.00. Following a non-jury trial,[2] the trial court determined that just compensation for Mr. Larsen's property was $9,000.00.

¶3 Mr. Larsen appealed, and the case was assigned to the Court of Civil Appeals. COCA affirmed the decision of the trial court in an unpublished 2-1 decision, with one judge writing in dissent. Mr. Larsen timely petitioned this Court for certiorari review, and we granted certiorari on September 19, 2016, to address an issue of first impression. For the reasons set forth below, we affirm the decision of the trial court.

Underground Storage of Gas

¶4 The Legislature has determined that "[t]he underground storage of natural gas which promotes conservation thereof, which permits the building of reserves for orderly withdrawal in periods of peak demand, which makes more readily available our natural gas resources to the domestic, commercial and industrial consumers of this state, and which provides a better year-round market to the various gas fields, promotes the public interest and welfare of this state." 52 O.S. 2011 § 36.2 (emphasis added). Under the Underground Storage of Gas statutes, "[a]ny public utility may condemn for its use for the underground storage of natural gas any subsurface stratum or formation in any land which the Commission shall have found to be suitable and in the public interest for the underground storage of natural gas. . . ." 52 O.S. 2011 § 36.3. Landowners whose property interests are being condemned for the underground storage of gas are entitled just compensation. See Ark. La. Gas Co. v. Latham, 1982 OK 50, ¶ 3, 650 P.2d 49, 49-50; 52 O.S. 2011 § 36.5.

Hunton Formation

¶5 The Hunton Formation (Reservoir) lies underneath approximately 900 acres of mostly rural property in Haskell County. The record reflects the Reservoir is a "well-defined porous limestone of an oval shape" with well-defined boundaries approximately 6,000 feet below ground.[3] The Reservoir is "bounded to the north by a fault and is an active water drive," and the "down structure wells have watered out and are depleted."[4] Stephens Production "drilled a well on the top of the structure," and that "well was wet and watered out."[5] No economically recoverable gas or oil remains in the Reservoir. The Reservoir contains 459.9 reservoir acres of which Mr. Larsen owns 68.4 reservoir acres or 14.87% of the total.

Oklahoma Corporation Commission Proceeding

¶6 Pursuant to the Underground Storage of Gas statutes, Stephens Production filed an Application with the Oklahoma Corporation Commission on September 24, 2008, seeking approval from the Commission to condemn certain property for the underground storage of natural gas in the Hunton Formation. The Commission held a hearing on December 11, 2008, wherein Stephens Production presented evidence in support of its Application. Three of the approximately twenty to twenty-five surface landowners, including Mr. Larsen, whose property would be subject to condemnation, submitted written statements in opposition of the Application.

¶7 On January 16, 2009, the Commission issued an Order approving Stephens Production's Application. The Commission found the Reservoir was suitable for the underground storage of natural gas, with its use for such purpose being in the public interest; that there was no economically recoverable oil or natural gas within the Reservoir underlying the property; and that such lands had a "greater value in utility as a gas storage reservoir for the purpose of ensuring an adequate supply of natural gas for an end user of natural gas and for the conservation of natural gas than for the production of the relatively small volumes of natural gas which remain there."[6] No party appealed the Order of the Commission, and it is final.

The Project

¶8 Prior to the Order of the Commission issued January 16, 2009, two companies, Arkansas Oklahoma Gas (AOG) and Spiro Storage, had previously purchased underground gas storage easements from approximately seven landowners in preparation to begin the Hunton Formation Project. AOG and Spiro Storage paid anywhere from $27.00 per acre to $100.00 per acre for the easements. AOG completed a "Phase One Reservoir Study" and selected this particular Reservoir because of its close proximity to an AOG pipeline and two other major pipelines, which carry gas to the east, including to Ft. Smith, Arkansas, and the surrounding areas.[7]

¶9 AOG contracted with an engineering firm to begin the Phase Two study when AOG determined it could no longer pursue the Project. Stephens Production, which is owned by the same family that owns both AOG and Spiro Storage, then obtained the easements already negotiated by AOG and Spiro Storage so as to continue the Project. Testimony from a Stephens Production engineer indicates that when the Project is complete, Stephens Production will fill the Reservoir with gas and sell it to AOG, which will then provide the gas to Ft. Smith and the surrounding areas during cold, demand months. Construction has not yet begun on the Project, but once Stephens Production secures the remainder of the easements through this eminent domain proceeding, Stephens Production will drill six wells on approximately eighty acres in the northwest corner of the 900-acre parcel. The Mann Property and the Chanthaseny Property, are included in such eighty acres, and the eighty acres are to the north of Mr. Larsen's property at the "top of the structure."[8] Roads will be made across the Mann Property and the Chanthaseny Property to get to the wells. Pipelines will be laid under the Mann Property. Completing the Project will cost approximately $50 million dollars. As of the date of the trial in December 2012, Stephens Production's engineer testified the company intended to complete the Project.

¶10 Mr. Larsen's property is an 80-acre parcel located on the eastern side of the 900-acre parcel. The Larsen Property is located in a rural area four miles east of Keota, Oklahoma, and three and one half miles south of Highway 9, in Haskell County. The property is vacant and is primarily wooded and slopes steeply from north to south. The property is forested and is minimally accessible by a gravel road on the west side of the property. There is no home on the Larsen Property. Mr. Larsen lives in Idaho. According to Stephens Production's engineer, the Larsen Property would be on the side of the underground structure in a "down dip" from the top of the structure, and as such, would not be a suitable site to inject or withdraw gas from the Reservoir.

Taking

¶11 The taking at issue in this appeal is an underground gas storage easement in that portion of the Reservoir lying underneath Mr. Larsen's property and a surface easement upon, over, and across that portion of Mr. Larsen's property necessary to conduct such gas storage operations. Pursuant to the surface easement, Mr. Larsen will maintain the right to make use of any such lands included within the easement so long as such use is not inconsistent with or dangerous to the construction, operation, maintenance, or reconstruction of the underground gas storage facility. Testimony from Stephens Production's engineer indicates that no roads, pipelines, wells, or facilities will be on Mr. Larsen's property when the Project is completed. The Oklahoma Corporation Commission has already determined the Project is for a proper public purpose. Thus, the only issue is the amount of just compensation owed Mr. Larsen for the taking of the underground gas storage easement and the surface easement.

Standard of Review

¶12 "In a non-jury trial the court's findings are entitled to the same weight and consideration that would be given to a jury's verdict." Soldan v. Stone Video, 1999 OK 66, ¶ 6, 988 P.2d 1268, 1270. Because the trial court is in the best position to evaluate the demeanor of the witnesses and to gauge the credibility of the evidence, we will defer to the trial court as to the conclusions it reaches concerning those witnesses and that evidence. Mueggenborg v. Walling, 1992 OK 121, ¶ 7, 836 P.2d 112, 114. On appeal, the trial court's findings will not be disturbed if there is any competent evidence to support them. Soldan, 1999 OK 66, ¶ 6, 988 P.2d at 1270.

Analysis

¶13 Section 36.5 of Title 52 specifically provides that proceedings to condemn property for the underground storage of natural gas "shall follow the procedure now provided by law in the exercise of the rights of eminent domain by railroads." 52 O.S. 2011 § 36.5. Accordingly, general condemnation principles apply to determine the fair market value of the property taken in this case. In an eminent domain proceeding, property owners "must be placed as fully as possible in the same position they occupied" before the taking, and "all presumptions must favor the landowner, not the condemnor," with eminent domain statutes being "strictly construed in the landowner's favor." State ex rel. Dep't of Transp. v. Lamar Advertising of Okla., 2014 OK 47, ¶ 12, 335 P.3d 771, 775. Once the condemnor proves the validity of the taking, the burden shifts to the landowner to prove the fair market value of the property. Id., ¶ 24, 335 P.3d at 777-78.

¶14 "Fair market value is the amount of money which a purchaser willing, but not obliged, to buy the property would pay to an owner willing, but not obliged, to sell it." Id., ¶ 18, 335 P.3d at 776. "There is no rigid formula for determining fair market value as a measure of just compensation," and "[t]he trial court is vested with wide discretion in determining what information it receives in a condemnation proceeding." Id., ¶¶ 9, 16, 335 P.3d 774-75. Evidence of the land's adaptability to a particular use may be considered in determining the fair market value. Del City v. Haynes, 1971 OK 45, ¶ 18, 483 P.2d 1152, 1154. However, when there is an "element of uncertainty" as to whether a condemned property can actually be used in a particular way, the evidence must establish that the particular use is "within a reasonable probability." McAlester Urban Renewal Auth. v. Lorince, 1972 OK 109, ¶ 9, 499 P.2d 925 928-29. Although a landowner is entitled to compensation for the highest and best use of the property, highest and best use of the property is determined at the time of the taking, and the effects of a proposed project on the condemned property cannot be considered in valuing a property. Eichman v. Okla. City, 1921 OK 392, ¶¶ 6-7, 202 P. 184, 185; U.S. v. 46,672.96 Acres of Land, 521 F.2d 13, 15-16 (10th Cir. 1975).

¶15 In Eichman v. Oklahoma City, 1921 OK 392, 202 P. 184, the city of Oklahoma City sought to condemn 3,000 acres of land from various landowners to construct a water reservoir to increase the water supply to Oklahoma City. Mr. Eichman, who owned approximately ninety of the 3,000 acres, sought just compensation for the value of the entire reservoir "in proportion to the part thereof owned by separate owners." Id., ¶ 8, 202 P. at 186. This Court rejected Mr. Eichman's request and held that "'[c]ompensation to the owner of one of many parcels of land taken by eminent domain for a site for a reservoir for a municipal water supply should not include any part of an increase in value for that purpose due to its union with other parcels if such union would not have been practicable, or have been attempted, except by the intervention of eminent domain.'" Id. (emphasis added).

¶16 The Court found that Mr. Eichman's land, by itself, possessed no intrinsic value for a reservoir and was suitable for a reservoir only in connection with the remaining lands. There was no evidence "of any prior demand for the property as a reservoir site or of any customer who would be willing to pay more for it for that purpose, or of any circumstance by which its value as a part of a natural reservoir site could be estimated or determined." Id., ¶ 10, 202 P. at 186. The Court found "no evidence tending, in the least, to show that there was any reasonable probability that the lands comprising the reservoir site, including the lands of [Mr. Eichman], could or would be united by agreement or purchase in such a way as to be available for a reservoir," and "nothing to indicate that any other city except Oklahoma City could utilize the lands taken for the purpose for which they were taken." Id. (emphasis added).

¶17 Eichman remains the law of this state and applies to the facts before us.[9] The parties' experts in this case agree that the portion of the Reservoir underneath Mr. Larsen's property cannot be used by itself for the underground storage of gas. The Reservoir extends well beyond Mr. Larsen's property, and any gas injected into the Reservoir by Mr. Larsen or at Mr. Larsen's property would migrate to fill the entire Reservoir--essentially creating a trespass. Thus, as Stephens Production's expert testified, Mr. Larsen could not individually realize any value from the Reservoir. Rather, for the Reservoir to be feasible and valuable, a combination of the owners' interests was, and is, absolutely necessary.

¶18 Mr. Larsen did not present any evidence of the reasonable probability of combination at trial. Although our record indicates there were approximately twenty to twenty-five surface owners involved, more than 140 Defendants were named in the Petition. Mr. Larsen presented no evidence at trial regarding which Defendants actually owned the necessary interests needed to combine, and he presented no evidence that he had in any way attempted to combine his property with the other interest owners to sell or lease rights to the Reservoir. No evidence was presented by Mr. Larsen concerning the cost of combination or the existence of any possible legal impediments to combining the properties.

¶19 Additionally, Mr. Larsen presented no evidence there was an active market for underground gas storage before Stephens Production began its project. When questioned about whether there was anyone else besides Stephens Production that wanted to develop the Hunton Formation, Mr. Larsen's expert testified at trial: "We asked if other people [were] interested in doing it. And we did not receive any information around the time of the appraisal."[10] Mr. Larsen presented no evidence that any other entity had approached him to purchase or lease an underground storage easement before the Stephens Production Project was approved in 2009. Stephens Production's expert testified there simply was no active market for underground gas storage in this area:

We looked for sales and leases of underground storage rights in about seven or eight counties . . . [t]o see if any existed. To see, first of all, is there any activity for underground storage in this area, any market going on. And we called every county clerk in all those counties; realtors to see if there was any activity at all . . . . What that showed is that there is no active market in that area. There is no activity.[11]

Mr. Larsen's expert's valuation of the property at $419,000.00--more than eight times the fee simple value of the entire 80-acre parcel--was premised on the completion and operation of an underground gas storage facility.[12] But without any evidence from Mr. Larsen regarding the reasonable probability of combination or the market demand for underground gas storage in the area, the highest and best use of the property was the use to which it was subject at the time of the taking--natural resource, agricultural, and recreational use. The record supports the trial court's valuation of just compensation at $9,000.00.[13]

Conclusion

¶20 The trial court followed general condemnation principles to determine the fair market value of the underground gas storage easement and the surface easement taken in this case. The court allowed both parties' experts to testify regarding their respective valuations, and the court was in the best position to evaluate the demeanor of the expert witnesses and to gauge the credibility of their testimony. We have reviewed the reports of both experts and their testimony at trial, and we conclude the trial court acted well within his discretion in allowing such evidence.

¶21 The law does not permit the court to "fix speculative, boom, or fancy values" on condemned property. Eichman, 1921 OK 392, ¶ 4, 202 P. at 185. Rather, the law requires a determination, based on the evidence presented, of the reasonable fair market value of the property at a "price for which it could have been sold by a person desirous of selling to a person wishing to buy," with "neither acting under compulsion, and both exercising intelligent judgment." Id., ¶ 5, 202 P. at 185. After thoughtfully considering the evidence presented, the trial court found $9,000.00 to be the reasonable fair market value for the underground gas storage easement and surface easement taken on and underneath the rural Haskell County property in this case. The court's decision is entitled to the same weight and consideration that would be given to a jury's verdict, and thus, we affirm.

COURT OF CIVIL APPEALS' OPINION VACATED; DECISION OF THE 
DISTRICT COURT AFFIRMED

¶22 ALL JUSTICES CONCUR

FOOTNOTES

[1] 52 O.S. 2011 §§ 36.1-36.7.

[2] The parties agreed to waive jury trial and have the matter tried before the judge. Record on Appeal at 394.

[3] Record on Appeal at 22.

[4] Id.

[5] Id.

[6] Record on Appeal at 22.

[7] Testimony from the record indicates that not every depleted reservoir is appropriate for storage because certain physical characteristics are necessary for a reservoir to be considered suitable for storage. The record indicates about 10% of depleted reservoirs are actually suitable for storage. Transcript of Trial Proceedings at 127-28.

[8] The engineer for Stephens Production and the engineer that testified on behalf of Mr. Larsen both agreed the wells had to be inserted at the top of the structure for purposes of storing and removing the gas.

[9] In Olson v. United States, 292 U.S. 246 (1934), the U.S. Supreme Court expressed a similar statement of law in a case involving the condemnation of lake shoreline flowage easements to create a reservoir to control the level of the lake. Several landowners sought just compensation based on the special adaptability of their lands for use for reservoir purposes which they argued had increased market value. The Court rejected this contention:

The use of shorelands for reservoir purposes prior to the taking shows merely the physical possibility of so controlling the level of the lake. But physical adaptability alone cannot be deemed to affect market value. There must be a reasonable possibility that the owner could use his tract together with the other shorelands for reservoir purposes or that another could acquire all lands or easements necessary for that use.

. . . .

Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value . . . .

Id. at 257 (emphasis added). Other states have taken a similar approach specifically in cases involving underground gas storage reservoirs. See, e.g., Consumers Power Co. v. Allegan State Bank, 174 N.W.2d 578 (Mich. Ct. App. 1969) (finding that increase in market value for land suitable for underground natural gas reservoir will not be applied "where the chance of different parcels of land being brought together by agreement or purchase, in such a way as to be available for the use, is to be regarded as too remote and speculative to have any legitimate effect upon the valuation"); Peoples Gas Light & Coke Co. v. Buckles, 182 N.E.2d 169 (Ill. 1962) (finding no reasonable possibility that the landowners in that case could use their land "together with the other lands necessary for a gas-storage field").

[10] Transcript of Trial Proceedings at 285.

[11] Transcript of Trial Proceedings at 599. Stephens Production's expert used a sales comparison approach to appraise the condemned property wherein the appraiser reviewed twenty-five comparable sales and found six to be most analogous, with sales ranging from $500.00 per acre to $1,281.00. Record on Appeal at 273. Taking an average of those properties, the appraiser set the value of Mr. Larsen's entire 80-acre parcel in fee simple at approximately $750.00 per acre, or $60,000, at the time of the taking. Id.

The appraiser also conducted an underground gas storage easement impact study wherein he attempted to find sales of land encumbered with similar underground gas storage easements and surface easements. No such sales were found in either Haskell County or Leflore County. However, such sales were found in Muskogee County as an underground reservoir known as the "Haskell Field" exists beneath certain acreage in that area. The appraiser then compared sales of properties with underground gas storage easements to sales of properties without underground gas storage easements and found that the underground gas storage easement caused an average of a 15% decline in value. The appraiser found no damages to the reminder of Mr. Larsen's property, thus valuing just compensation at $9,000.00. Record on Appeal at 275-80.

[12] Record on Appeal at 153. Mr. Larsen's expert appraised the condemned property by "means of comparable leases on land sites with underground natural gas storage reservoirs" using "rents on a per acre basis." Record on Appeal at 155. Rents were "calculated on the entire 900 project acres which encompasses the Hunton Formation" and then pro-rated according to Mr. Larsen's 80-acre parcel. Record on Appeal at 156.

Reviewing underground gas storage leases from Alaska, California, Oklahoma, and Texas, the appraiser analyzed the market value using an annual rent per acre lease analysis, an annual rent per injection/withdrawal lease analysis, and an annual rent as a percent of revenues lease analysis. Evaluating and comparing each method, the appraiser selected a market rent at $230,000.00 for the entire 900 acres. The appraiser then concluded under a "capitalization to value" method that the "market value of the entire 900 acre Hunton Formation underground natural gas storage cavern upon completion and operation of the facility would be $3,432,836.00." Record on Appeal at 167. The appraiser then allocated the value of Mr. Larsen's 80 acres at $385,000.00.

The appraiser also found damages to the remainder of the property taken at approximately $34,000.00 based on a sales comparison approach. In valuing damages to the remainder, the appraiser valued Mr. Larsen's 80-acre parcel in fee simple at $625.00 per acre or approximately $50,000.00. The appraiser found the total value of just compensation to be $419,000.00.

[13] The trial court considered the reasonable probability of combination in valuing just compensation. The transcript of the court's ruling provides:

And the other factor I'm looking at, in conjunction with the evidence, is I think this use, the limited ability of an individual user to use it, affects the market value in this case. Because, I mean, the bottom line is if I've got a valuable right on my property and I can't use it it's not of much value to me. So, therefore, it's not going to affect the value to me or some other use. . . .

I think the transmission line [example] is kind of similar. . . . [T]he bottom line is taking that air space and taking that use of my property doesn't affect my use of it very much and it's nothing I can use. I can't go out and be a transmission line company and put in transmission lines, or market it as the best place in the world for a transmission line. I can't go out and do that. And I can't realistically can't [sic] gather up everybody between two big transmission lines and get together and say, 'Hey, this is the best place for it. This is the only place reasonable. And let's go in the transmission line business.' The realities are you can't do that. . . .

[T]he lack of ability to the individual owner who owns part of the reservoir to use all of it, I think those are all factors that go into the market value determination, [and] that fact that it doesn't really affect the common surface use of it that you see commonly used for. Transcript of Ruling at 6-7.

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1992 OK 121, 836 P.2d 112, 63 OBJ 2315, Mueggenborg v. Walling
Discussed
 1921 OK 392, 202 P. 184, 84 Okla. 20, EICHMAN v. OKLAHOMA CITY
Discussed at Length
 1971 OK 45, 483 P.2d 1152, DEL CITY v. HAYNES
Discussed
 1972 OK 109, 499 P.2d 925, McALESTER URBAN RENEWAL AUTHORITY v. LORINCE
Discussed
 2014 OK 47, 335 P.3d 771, STATE ex rel. DEPT. OF TRANSPORTATION v. LAMAR ADVERTISING OF OKLAHOMA, INC.
Discussed
 1982 OK 50, 650 P.2d 49, Arkansas Louisiana Gas Co. v. Latham
Discussed
 1999 OK 66, 988 P.2d 1268, 70 OBJ 2176, Soldan v. Stone Video
Discussed at Length
Title 52. Oil and Gas
 Cite
Name
Level

 52 O.S. 36.1, Definitions
Discussed
 52 O.S. 36.2, Underground Storage
Cited
 52 O.S. 36.3, Eminent Domain - Use and Limitations
Cited
 52 O.S. 36.5, Proceedings
Discussed