OSCN Found Document:Carter v Carter et al.

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 Carter v Carter et al.
2025 OK CIV APP 15
Case Number: 122068
Decided: 04/25/2025
Mandate Issued: 05/22/2025
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION I
Cite as: 2025 OK CIV APP 15, __ P.3d __

 

JESSICA RAYLENE CARTER, Defendant/Appellant
vs.
KATRINA CHARLENE CARTER, C.B.C., Minor, D.K.M., Minor, L.R.G., Minor, Plaintiffs/Appellees

APPEAL FROM THE DISTRICT COURT OF
ROGERS COUNTY, OKLAHOMA

HONORABLE SUE NIGH, TRIAL JUDGE

AFFIRMED

Janice Steidley, STEIDLEY LAW FIRM, Claremore, Oklahoma, For Defendant/Appellant,

Sofia Johnson, Jeff Price, PRICE LAW, PC, Claremore, Oklahoma, For Plaintiffs/Appellees. (Trial Counsel Only) 

Thomas E. Prince, Judge:

¶1 Jessica Carter (Defendant/Appellant) has appealed the trial court's grant of a Protective Order finding Katrina Carter and two minor children, C.B.C. and D.K.M., (Plaintiffs/Appellees) were victims of harassment as defined by 22 O.S. § 60.1

BACKGROUND

¶2 Katrina Carter filed the underlying Petition for Protective Order on December 5, 2023, seeking a Protective Order against Jessica Carter on behalf of herself and three minor children, C.B.C., D.K.M., and L.R.G. Jessica and Katrina are sisters-in-law via marriage, as their respective spouses are brothers, and Jessica is the biological mother of C.B.C. and D.K.M. Katrina is the biological mother of L.R.G. Katrina's Petition alleged Jessica had repeatedly harassed and stalked Katrina and the three minor children on the evening of December 2, 2023 during the town's Christmas parade. At the time of the Petition, Katrina was the guardian of C.B.C. and D.K.M., having been assigned guardianship in a separate action. 

¶3 The trial court held a hearing on Katrina's Petition for Protective Order on December 14, 2023, during which both Katrina and Jessica appeared pro se. Jessica requested a continuance which the trial court granted, continuing the proceedings until January 4, 2024. When the trial court resumed the proceedings for the January 4, 2024 hearing, Jessica was late to court and did not appear for the calling of the docket, prompting the trial court to enter a five (5) year Final Order of Protection via default judgment. Jessica, thereafter, filed a Motion to Set Aside Default Protective Order, which the trial court granted on February 1, 2024, following a hearing. After setting aside the Default Protective Order, the trial court scheduled another hearing for Katrina's Petition for Protective Order for February 29, 2024.

¶4 The trial court reconvened for the hearing

¶5 After the group relocated and continued watching the parade, Katrina turned around to see Jessica, again, standing right next to the children. Katrina recounted stepping in between the children and Jessica, which caused Jessica to get very upset and start to scream about her outrage over Katrina's guardianship of C.B.C. and D.K.M. As the situation escalated, Katrina noted that one of the children began to cry, spurring Katrina to wrap her arms around the three children in an attempt to move them away from Jessica. At this point, Katrina explained that Patrick moved in between Jessica and the rest of the group, after which Jessica began to scream in Patrick's face and shout derogatory statements about drug use. Katrina described her attempts to walk the children away but indicated that Jessica continued following the group until one of the children began yelling at Jessica. Katrina and Patrick then managed to separate the group from Jessica, after which they called the police. Katrina described the children's demeanor after the incident as "angry, emotionally distraught, [and] scared," noting that D.K.M. "shut down" and was afraid to go out much. When asked why Katrina felt like she and the children needed a Protective Order, she stated that she "believe[d] that these instances [were] going to continue to happen" and that she "want[ed] to be able to take the kids to events in the town that they live in and not be afraid of these things happening." Katrina stated that a protective order would serve the best interests of the children and expressed her fear that, without a protective order, Jessica would continue to attempt to contact the children.

¶6 Jessica also testified as to her recollection of the December 2, 2023 incident, explaining that she attended the Christmas parade with her boyfriend and a good friend, but did not know that her two biological children would also be in attendance. Jessica indicated that after first noticing Katrina, Patrick, and the three children at the parade, Jessica gestured "I love you" to one of the children, which Jessica stated the child reciprocated. Jessica attested to crossing to the same side of the street as Katrina, Patrick, and the children and standing stationary behind them. Despite the fact that Jessica saw the children across the street and, subsequently, crossed the street to stand directly behind them, Jessica maintained that she was not following Katrina, Patrick, and the children. Jessica recalled Katrina told her to stay away and, thereafter, Katrina walked the children away.

¶7 Jessica maintained that she continued to walk around the parade festivities and, again, found herself standing an arms-length distance away from Katrina, Patrick, and the children as a matter of happenstance. Jessica explained that she reached out to touch D.K.M.'s shoulder to tell him that she loved him, but, soon after, Katrina noticed Jessica and began to take pictures, telling Jessica to "get away from [her] boys." Jessica admitted that Katrina's reference to C.B.C. and D.K.M. as "her boys," caused Jessica to get very upset, even acknowledging that she told a responding officer it was at that moment when she "lost it." Jessica stated that she began to yell at Katrina and Patrick that C.B.C. and D.K.M. were "not [their] boys" and will "never be [their] boys". When Patrick positioned himself in between Jessica, Katrina, and the children, Jessica claimed that Patrick began calling Jessica mean names and slurs, after which Jessica attested to accusing Patrick of drug use. Jessica contended she was not the aggressor, maintaining she only started yelling after Patrick "got in her face", but admitted that, despite Katrina's repeated requests to leave them alone, Jessica chose not to walk away. Jessica stated that she decided to walk away only after she saw C.B.C. get visibly upset and tell Jessica "Mom, just leave, just leave." After separating, Jessica attested to making a verbal report with a police officer at the parade, but confirmed she never completed a written statement of the incident. Jessica's testimony additionally confirmed she was well aware of the Guardianship Order and its restriction of Jessica's physical contact with the children.

¶8 In addition to Katrina and Jessica's testimony, Officer Roy Fincel also provided testimony of the incident as the responding officer, largely corroborating Katrina's account of the events. Officer Fincel first spoke with Katrina and Patrick who informed Officer Fincel that Jessica had accosted them at the Christmas Parade. After getting statements from both Katrina and Patrick, Officer Fincel spoke with one of the minor children who provided his recollection of the incident. Officer Fincel described the child's demeanor as scared, frightened, and angry, noting the child was crying and looking over his shoulder as he tried to recount the incident with Jessica. Officer Fincel testified that nothing the child said caused him to disbelieve Katrina's account of the December 2nd incident. After collecting information from Katrina and Patrick, Officer Fincel spoke with Jessica, who maintained she had not been following Katrina, Patrick, and the children, but admitted to making contact with Patrick when the situation escalated. Officer Fincel maintained that Jessica informed him that there was a lot of yelling, and that she had made some derogatory statements about drug use. Officer Fincel additionally noted that he asked both Katrina and Jessica to complete a voluntary written statement describing the incident, but only Katrina ended up completing a written statement which was included in the record.

¶9 Upon consideration, the trial court granted Katrina, D.K.M., and C.B.C. two-year protective orders based upon Jessica's harassment on December 2, 2023, but found that L.R.G. did not qualify for a protective order. The trial court found that Jessica exhibited a "course of conduct" constituting harassment by continuing to follow Katrina, Patrick, and the children despite Katrina's concerted effort to move away from Jessica. The trial court concluded that, from Katrina's perspective, "Ms. Jessica Carter was pursuing the plaintiffs, to get closer." The trial court referenced Katrina's testimony that Jessica repeatedly screamed at her, causing the youngest child to cry while the other two were unsure what to do. Although Katrina and Jessica had conflicting accounts of the December 2, 2023 incident, the trial court found that Officer Fincel's "very specific" testimony corroborated the "substantial distress that this mother caused her child." The trial court explicitly stated that "the testimony from [Jessica] [was] not credible", while finding that Katrina's testimony "was credible", ultimately granting the protective orders "based on the credibility of the witnesses and the greater weight of the evidence and based upon a review of [Jessica's pictures from the parade], as well as the stipulation entered by the parties". Jessica, thereafter, initiated this timely appeal.

STANDARD OF REVIEW

¶10 A trial court's issuance of a protective order is reviewed on appeal for an abuse of discretion. Curry v. Streater, 2009 OK 5213 P.3d 550Id. (citing State ex rel. Tal v. Oklahoma City, 2002 OK 9761 P.3d 234Id. (citing Oklahoma Tpk. Auth. v. Little, 1993 OK 116860 P.2d 226de novo review. Schlumberger Tech. Corp. v. Paredes, 2023 OK 42528 P.3d 772De novo review provides this Court with plenary, independent, and non-deferential authority to reexamine a trial court's legal rulings. Kluver v. Weatherford Hosp. Auth., 1993 OK 85859 P.2d 1081

ANALYSIS

¶11 Jessica has alleged three issues22 O.S. § 60.1

¶12 The Protection from Domestic Abuse Act ("the Act") allows a victim of domestic abuse, stalking, harassment, or rape to petition the court for a protection order. Curry v. Streater, 2009 OK 5213 P.3d 550citing 22 O.S.Supp.2003, §§ 60.1

'Harassment' means a knowing and willful course or pattern of conduct by a family or household member or an individual who is or has been involved in a dating relationship with the person, directed at a specific person which seriously alarms or annoys the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial distress to the person. 'Harassment' shall include, but not be limited to, harassing or obscene telephone calls in violation of Section 1172 of Title 21 of the Oklahoma Statutes and fear of death or bodily injury;

22 O.S. § 60.1See e.g., Watts v. Hensley, 2000 OK CIV APP 414 P.3d 45 The Act also imposes objective and subjective standards to evaluate the conduct at issue, requiring the party seeking the protective order to demonstrate both that the conduct "would cause a reasonable person to suffer substantial emotional distress" and that the conduct "actually cause[d] substantial distress to the person." See e.g., Null v. Polin, 2014 OK CIV APP 12319 P.3d 689.

¶13 A "one-time occurrence" is considered inadequate for purposes of a claim of "harassment." See Curry v. Streater, 2009 OK 5213 P.3d 550See Tate v. Browning-Ferris, Inc., 1992 OK 72833 P.2d 1218Hill v. Board of Education, District I-009, Jones, Oklahoma, 1997 OK 107944 P.2d 930In the Matter of the Estate of Foresee, 2020 OK 88475 P.3d 862 way of acting". See www.merriam-webster.com/dictionary/course; and the term "pattern" has been defined as "a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution. See www.merriam-webster.com/dictionary/pattern.

¶14 In this case, Jessica argues that her behavior over the course of a single evening could not have constituted a "course or pattern of conduct", maintaining it was an isolated incident which did not present a pattern of harassment. In support of this contention, Jessica analogized her conduct to that of the defendants in both Curry v. Streater, 2009 OK 5213 P.3d 550Watts v. Hensley, 2000 OK CIV APP 414 P.3d 45Curry, the party seeking the protective order cited only a single verbal exchange in isolation as alleged "harassment," and the Supreme Court found that the single event, alone, could not constitute a "course or pattern of conduct". In Watts, a teacher sought a protective order against a parent based upon the parent's alleged harassment, citing to two "altercations" which occurred in quick succession. The first occurred between the two parties in the school gymnasium, after which the teacher brought the parent into her office and briefly left to locate the school superintendent. The second occurred shortly thereafter upon the teacher and superintendent's return to the office. This Court found that these two "altercations" only constituted a single event and, thus, were insufficient to demonstrate "a course or pattern of conduct" necessary to establish "harassment" under 22 O.S. § 60.1Watts is distinguishable from the facts in this case because the teacher there did not try to escape from or otherwise avoid further interaction with the parent. Rather, the teacher voluntarily directed the parent to go to her office where she had him briefly wait before returning with the superintendent. Id., ¶ 2. Upon returning to the gymnasium office, only the superintendent met with the parent while the teacher waited outside the office and did not actually interact again with the parent that day. Id., at ¶ 2. Thus, the facts in Watts revealed a single interaction between the parties. Id., at ¶ 7. Moreover, in Watts, there was no attempt by the teacher to permanently separate herself from the parent after their "altercation."

¶15 Unlike the defendants in Curry and Watts, Jessica repeatedly followed and attempted to interact with Katrina, Patrick, and the children despite their concerted efforts to stay away from Jessica. Katrina and Jessica's testimony confirmed that Jessica attempted to approach the children several times over the course of the evening and that Katrina continuously asked Jessica to leave them alone. Jessica admitted that she did not walk away after these requests, instead requiring Katrina, Patrick, and the children to attempt to continuously evade Jessica's pursuit of the group throughout the course of the evening. Here, Katrina and Patrick made several attempts to get away from Jessica every time she was nearby, making clear they did not want her to interact with the children as stipulated by the Guardianship Order. The facts here do not show a single event. Katrina and Patrick separated themselves from Jessica following each incident, causing a reasonable person to likely view the various incidents to demonstrate an observable characteristic, tendency, or way of acting by Jessica that she would likely repeat without the issuance of the requested protective order. Accordingly, we find that Jessica's repeated attempts to interact with Katrina, Patrick, and the children over the course of one evening, in addition to her refusal to abide by their requests to leave the children alone, constituted "a knowing and willful course or pattern of conduct".

¶16 Jessica further maintained that her behavior did not cause Katrina, C.B.C. and D.K.M. to "actually fear[] death, bodily injury or experience[] emotional distress." We are unconvinced. Beyond Katrina's testimony regarding of her own emotional state, Katrina also attested that the children were angry, emotionally distraught, and scared following the incident, leading one of the children to "shut down" and become reclusive. Officer Fincel further corroborated Katrina's recitation of events, noting that he personally observed the children's obvious emotional distress when asking the child questions about what had happened. Even Jessica, herself, confirmed the children were visibly distressed following the incident, as Jessica specifically testified that she decided to walk away only after noticing that one of the children was very upset and pleading with her to "just leave." The bulk of the evidence on appeal hinged upon witness testimony, and, after weighing the evidence, the trial court was, ultimately, more compelled by Katrina and Officer Fincel's account of the incident. The credibility of witnesses and the effect and weight of conflicting or inconsistent testimony are questions of fact to be determined by the trier of fact and are not questions of law for this Court on appeal. Bills v. Bills, 2022 OK CIV APP 27514 P.3d 485 (citing Estate of Gerard v. Gerard, 1995 OK 144911 P.2d 266Matter of Estate of Whitehouse, 2020 OK CIV APP 59479 P.3d 230citing Stephens Production Co., a division of SF Holding Corp. v. Larsen, 2017 OK 36394 P.3d 1262Berry & Berry Acquisitions, LLC v. BFN Properties LLC, 2018 OK 27416 P.3d 1061

CONCLUSION

¶17 Based upon the foregoing analysis, we find no error in the trial court's grant of a protective order based upon Jessica's harassment of Katrina, C.B.C., and D.K.M. The record supports the trial court's finding that Jessica engaged in a "knowing and willful course or pattern of conduct" which would both cause a reasonable person to suffer substantial emotional distress and actually caused Katrina, C.B.C., and D.K.M. substantial emotional distress. Accordingly, the trial court's Order is affirmed.

SWINTON, J., concurs and GOREE, P.J., concurs in result.

GOREE, P.J., concurring in result:

I concur that issuing the Protective Order was not an abuse of discretion. The Order of Protection, paragraph (C)(5), prohibits Defendant from both harassing and stalking. I would affirm the Order based on the definition of stalking, which includes "repeated following . . . of a person by an adult . . ." 22 O.S. §60.1

FOOTNOTES

 

Sneed v. Sneed, 1978 OK 138585 P.2d 1363 Holeman v. White, 2012 OK CIV APP 107292 P.3d 65citing Hamid v. Sew Original, 1982 OK 46645 P.2d 496

While we address issue two (2) in the body of this Opinion, Jessica failed to brief issues one (1) and three (3) in her Br.-in-Chief, and we will not consider propositions of error which are unaddressed in an appellate brief. Christie-Stewart, Inc. v. Paschall, 1974 OK 138544 P.2d 505Perry v. Meek, 1980 OK 151618 P.2d 934McLaughlin v. McLaughlin, 1999 OK 34979 P.2d 257

See 22 O.S., § 60.1Stalking also means a course of conduct composed of a series of two or more separate acts over a period of time, however short, evidencing a continuity of purpose or unconsented contact with a person that is initiated or continued without the consent of the individual or in disregard of the expressed desire of the individual that the contact be avoided or discontinued. Unconsented contact or course of conduct includes, but is not limited to:

a. maintaining a visual or physical proximity to the individual,

b. approaching or confronting that individual in a public place or on private property,

c. appearing at the workplace of the individual or contacting the employer or coworkers of the individual,

d. appearing at the residence of the individual or contacting the neighbors of the individual,

e. entering onto or remaining on property owned, leased or occupied by the individual,

f. contacting the individual by telephone, text message, electronic message, electronic mail, or other means of electronic communication or causing the telephone or electronic device of the individual or the telephone or electronic device of any other person to ring or generate notifications repeatedly or continuously, regardless of whether a conversation ensues,

g. photographing, videotaping, audiotaping, or, through any other electronic means, monitoring or recording the activities of the individual. This subparagraph applies regardless of where the act occurs,

h. sending any physical or electronic material or contacting the individual by any means, including any message, comment, or other content posted on any Internet site or web application,

i. sending to a family member or member of the household of the individual, or any current or former employer of the individual, or any current or former coworker of the individual, or any friend of the individual, any physical or electronic material or contacting such person by any means, including any message, comment, or other content posted on any Internet site or web application, for the purpose of obtaining information about, disseminating information about, or communicating with the individual,

j. placing an object on, or delivering an object to, property owned, leased or occupied by the individual,

k. delivering an object to a family member or member of the household of the individual, or an employer, coworker, or friend of the individual, or placing an object on, or delivering an object to, property owned, leased, or occupied by such a person with the intent that the object be delivered to the individual, or

l. causing a person to engage in any of the acts described in subparagraphs a through k of this paragraph; and . . ." .

 
 
 
 
 
 
 
 
 
 The Oklahoma Supreme Court
 2100 N. Lincoln Blvd., Suite 1
 Oklahoma City, OK 73105